# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN RE:<br>JOSEPH KYLE DAILEY,<br>    Debtor,<br>_____<br><br>WILLMAR ELECTRIC SERVICES CORP.,<br>    Appellant,<br>vs.<br>JOSEPH KYLE DAILEY,<br>    Appellee. | BANKRUPTCY NO. BK A13-4040<br>CHAPTER 7<br>_____<br><br>4:18CV3016<br><br>MEMORANDUM OPINION |

This matter is before the Court on appeal of Willmar Electric Services Corp. (Willmar) from the judgment issued by the United States Bankruptcy Court for the District of Nebraska[1] (the "Bankruptcy Court"), in favor of Appellee Joseph K. Dailey. BK ECF No. 96.[2] For the reasons stated below, the judgment of the Bankruptcy Court will be affirmed.

## PROCEDURAL BACKGROUND

On March 30, 2016, Dailey filed a petition for discharge under Chapter 7 of the Bankruptcy Code. During the pendency of the Chapter 7 proceedings, Willmar filed an

---

[1] The Honorable Thomas L. Saladino, Chief United States Bankruptcy Judge for the District of Nebraska.

[2] The parties have not filed an appendix because the Court permitted the parties to proceed on the original record. ECF No. 9. Accordingly, except as noted below, references to the "BK ECF No." are to the original record as listed in the docket sheet in the Bankruptcy Court, *Willmar Elec. Servs. Corp. v. Dailey*, Case No. 16-04021-TLS (D. Neb. Bankr. July 22, 2016).

adversary action, asserting that Dailey's debts to Willmar were not dischargeable because they were obtained through fraudulent and malicious representations.

The Bankruptcy Court made oral findings of fact and conclusions of law, at BK ECF No. 106, Tr.[3] 126:3-136:15, and held that Wilmar failed to meet its burden to prove Dailey's debt was not dischargeable. Willmar elected to have the appeal heard by this Court, and filed its Brief, ECF No. 8, and the record in support of its appeal, ECF Nos. 2, 6, 11. Dailey did not respond to Willman's Brief because Dailey's counsel of record, Kevin J. O'Connell, was not responsive to his client nor to the Court. O'Connell has not moved to withdraw, yet he has failed to respond to the Court's Order to Show Cause, ECF No. 10, and has failed to respond to the Court's efforts to contact him directly. O'Connell's conduct has prolonged the Court's review of this matter and may be the subject of future disciplinary proceedings.

Notwithstanding Dailey's lack of response, the Court has thoroughly reviewed the arguments and evidence in this case. For the reasons discussed below, the judgment of the Bankruptcy Court will be affirmed.

## FACTUAL BACKGROUND

### I. Subcontract and Lien Waivers

In 2014, Willmar contracted with Lincoln Public Schools (LPS) to provide labor and materials for LPS Security & Technology Projects in schools in Lincoln, Nebraska (the "LPS Projects"). Tr. 9, 23-24. Willmar subcontracted cabling for the LPS Project to

---

[3] The abbreviation "Tr." refers to the trial transcript before the Bankruptcy Court, found at BK ECF Nos. 105 and 106.

SequrComm, Inc ("SequrComm"). Tr. 20, 24-25; BK ECF No. 36. Dailey was the CEO of SequrComm during the LPS Projects.

As a condition to getting any payment from Willmar, SequrComm promised to pay its suppliers. BK ECF No. 36, ¶¶ 1.9, 1.10, 3.1(d); Tr. 24. Anixter, Inc. (Anixter) was SequrComm's largest supplier for the LPS Project, supplying over 90 percent of the materials and supplies. Tr.(2) 135, Tr. 33. To confirm SequrComm was paying its suppliers and materialmen, Willmar required SequrComm to sign waivers titled "Unconditional Waiver and Release Upon Progress Payment" (the "Lien Waivers"). BK ECF Nos. 37-39. Dailey admitted he signed four Lien Waivers. Each of the Lien Waivers contained this representation:

> The undersigned warrants that he either has already paid or will use the monies he receives from this progress pyment [sic] to promptly pay in full all of his laborers, subcontractors, materialmen and suppliers from [sic] all work, materials, equipment or service provided for or to the above referenced project up to the date of this waiver.

Tr. 45, 132; BK ECF Nos. 37, 38, 39, 86. Dailey understood this language to mean that SequrComm had either "already paid" its suppliers, Tr. 133-134, or would use monies received from progress payments to pay its suppliers promptly. Tr. 133, 63-65.

SequrComm applied for payment on the LPS Project twice per month. For each request for payment, SequrComm filled out Payment Applications on an American Institute of Architects form, completed its own Invoices, and completed the Lien Waivers. Tr. 23, 24, 28-32; Tr.(2) 16-18. Willmar trained SequrComm personnel to fill out the payment documents, including the Lien Waivers. BK ECF Nos. 53, 54, 57; Tr. 49-50. The documents' purpose was to verify the amount of labor and supplies provided and included in the payment application. Tr. 28-35, 43, 83-84; BK ECF Nos. 51-55, 57, 59. Willmar asserts that the Lien Waivers were crucial because if SequrComm refused to fill out Lien

3

Waivers, Willmar would have known there was a problem with SequrComm's payment of suppliers and Willmar could have stopped making payments to SequrComm, or paid suppliers directly, or taken other action. Tr. 54.

Dailey and others at SequrComm knew the Lien Waivers were given to Willmar. Tr. 141-144; Tr.(2) 16, 52, Tr. 83. Dailey and others at SequrComm also knew the Lien Waivers had to be signed for SequrComm to get paid. Tr.(2) 16-17, Tr. 141; *see also* BK ECF No. 59 ("I have a check for you but I am unable to send it to you until the two attached lien waivers have been signed and emailed back to me."); BK ECF Nos. 53-57, 59, 65.

## II. SequrComm Financial Problems

In the spring and summer of 2014, SequrComm was in serious financial trouble. Tr. 85, 99. Cash flow had become such a problem that on May 30, 2014, Dailey requested that Chris Armitage,[4] a relatively new employee at SequrComm, make a $25,000 loan to the company to make payroll. Tr. 76-77, 99. SequrComm also needed additional financing to pay for the large amount of supplies anticipated for the LPS Project. Tr. 85, 86, 159. In May or June 2014, SequrComm sought financing from its bank, Great Western Bank ("GWB"), but was denied due to SequrComm's failure to make payments on existing debts. Tr. 85, 86.

SequrComm was unable to pay its bills in June 2014. Tr. 76, 85. Creditors called and wrote on a regular basis demanding payment. Tr. 78. Armitage testified that she told Dailey of the vendors' demands for payment, and Dailey made decisions about which would get paid. Tr. 78, 85, 93. SequrComm was also attempting to deal with existing

---

[4] Armitage's role within SequrComm was described in different ways. Some witnesses described her as the CFO. It is undisputed that she was involved in handling finance and payment issues for SequrComm.

4

debts to GWB that were guaranteed by SequrComm's owners and directors. Tr. 87; Tr.(2) 15, 29. Emails from May 2014 show that SequrComm was negotiating with GWB to use the money SequrComm received from Willmar on the LPS Project to pay down the loans. BK ECF No. 63; Tr. 85-86, 99. Dailey was included on at least one of the emails. BK ECF No. 63 at 2.

Throughout this time, SequrComm owed an increasingly large debt to Anixter. There is conflicting evidence about what and when Dailey knew about SequrComm's debt to Anixter. Dailey explained that he was not aware of the magnitude of the debt because he did not handle bookkeeping or finance. Tr. 134-35. According to other SequrComm employees, Dailey oversaw invoicing, and had "decision-making authority over which vendors" and accounts payable were paid. *See, e.g.* Tr.(2) 19-20, 39- 41, 50- 51. Armitage testified that she spoke to Dailey frequently about Anixter. Stephen Boggs testified that between July 7 and 10, 2014, he called Dailey to tell him Anixter demanded payment. Tr. 119-121, 124-125. In response, Dailey told Stephen Boggs to "knock off questions about Anixter payments." Tr. 126. Boggs threatened to tell Willmar that SequrComm was "way behind on its financial obligations" to Anixter. BK ECF No. 61; Tr. 81, 121-122. Dailey disputed the nature of his confrontation with Boggs, and testified that the conversation took place in August 2014, not July.

### III. The July 2014 Lien Waivers

In early July 2014, Dailey signed two Lien Waivers to support payment from Willmar. SequrComm deposited the funds on July 10 or 11, 2014. BK ECF Nos. 42-2,

5

66, 75 at 22.  Dailey signed another two Lien Waivers later in July 2014.[5] BK ECF Nos. 38, 39, 42; Tr. 41, 64-66, 69, 132. Willmar made a third payment on August 8, 2014, based on receipt of the Lien Waivers. BK ECF Nos. 40-42; Tr. 42-43, 68-69, 112.  Dave Chapin at Willmar testified that Willmar would not have paid SequrComm without the Lien Waivers. Tr. 69, BK ECF No. 59.  Relying upon the representations in the Lien Waivers, Willmar paid SequrComm $1,106,931.55. BK ECF No. 42; Tr. 42.

Dailey testified that at the time he signed the Lien Waivers, he believed them to be accurate.  Tr.(2) 93.  He also testified that he intended to pay Anixter for the supplies and parts SequrComm received, and never directed anyone to withhold payment to Anixter, nor to funnel payment to other creditors.  Tr.(2) 93.  Dailey admitted he "understood there was a connection between [him] personally signing lien waivers, and SequrComm getting paid from Willmar Electric."  Tr. 141. He also admitted he understood his Lien Waivers would be provided to Willmar and it would rely on them. Tr. 144-145.

Dailey testified that on August 6, 2014, he first learned that SequrComm was not paying Anixter. Tr. 134-135; Tr.(2) 99-100. On that day, according to Dailey, he received an email from Shane Sweet at Anixter inquiring about payment status and representing that Anixter would not supply further product without receiving payment.  BK ECF No. 62. Dailey testified that after he received the email he called Sweet and asked whether SequrComm was behind on payments to Anixter.  Tr. 136.  Sweet told Dailey that SequrComm was on a "slow pay."  Tr. 136.  Dailey understood "slow pay" to mean that SequrComm was only a little behind, and Anixter would continue to supply materials if it

---

[5] Some of the Lien Waivers are undated. As best the Court can discern from the record, they were signed in early to mid-July 2014.

received "some money."  Tr. 137.  Dailey testified that he resolved the issue by directing Armitage to send payment to Anixter.  Tr.(2) 94. Armitage agreed and "next thing I know we're getting more supplies."  Tr.(2) 94.

Although Anixter again provided supplies, SequrComm did not pay Anixter with the funds Willmar paid SequrComm, either before or after Dailey signed the Lien Waivers. Tr. 54-61, 99.  At some point between the time when SequrComm unsuccessfully applied for loans from GWB and when Willmar sent payment based on the Lien Waivers, SequrComm entered into a "factoring" agreement with a company called "Liquid Capital." While the terms of the factoring agreement are unclear from the record, it appears undisputed that Liquid Capital received funds that had come from Willmar.  Once Liquid Capital received those funds, SequrComm's debt to GWB was paid down with the funds. It is unclear who authorized the payments to GWB or if the payments were part of the factoring agreement, but Anixter was not paid from the Willmar funds.  Because SequrComm never paid Anixter, Anixter submitted a claim against Willmar's payment bond in December 2014 to recover the amounts SequrComm failed to pay, and Willmar paid Anixter.  BK ECF No. 44; Tr. 54-61.

## IV.  The Bankruptcy Court's Decision

The Bankruptcy Court issued findings orally on the record.  It acknowledged the conflicting evidence about whether Dailey decided which invoices were paid and whether he knew about SequrComm's debt to Anixter at the time he signed the Lien Waivers.  The Bankruptcy Court concluded that "most of the testimony said he did not [have access to the accounting records], not all of it, but most of it."  Tr.(2) 128, 132.  The Bankruptcy Court also specifically found that Dailey learned about the lack of payment to Anixter from

7

Shane Sweet's email on August 6, 2014. Tr.(2) 128. The Bankruptcy Court acknowledged that Dailey may have known of a problem with Anixter based on the testimony of Stephen Boggs who said he discussed it with Dailey between July 7 and 11, 2014, but the Bankruptcy Court concluded the problem may have appeared to Dailey to be resolved when Anixter re-commenced delivery of supplies. Thus, even if Dailey had notice of problems with Anixter between July 7 and 11, 2014, that was not sufficient "to notify [Dailey] that there is a huge balance due to Anixter on that date." Tr.(2) 129.

The Bankruptcy Court applied the elements of 11 U.S.C. § 523(a)(2)(A) and concluded that Willmar failed to show that Dailey intentionally deceived Willmar when he certified that Anixter had been paid or would be paid promptly. The Bankruptcy Court reasoned that the preponderance of the evidence failed to show Dailey knew of the debt to Anixter or that Dailey had no intention to pay. The Bankruptcy Court also concluded that Willmar had not shown its reliance on the Lien Waivers was justifiable because Willmar should have had several concerns about SequrComm's financial ability. Accordingly, the Bankruptcy Court dismissed Willmar's claim.

## STANDARD OF REVIEW

This Court has jurisdiction over appeals from final judgments and orders of the Bankruptcy Court under 28 U.S.C. § 158(a)(1). The Bankruptcy Court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo. *In re M & S Grading, Inc.,* 526 F.3d 363, 367 (8th Cir. 2008); s*ee also* Fed. R. Bankr. P. 8013. This Court may affirm, reverse or modify the Bankruptcy Court's ruling or remand the case for further proceedings. Fed. R. Bankr. P. 8013.

## DISCUSSION

In general, courts must grant a Chapter 7 debtor a discharge to effectuate the "fresh start" policy of the code. *See* 11 U.S.C. § 727(a); *In re Fields*, 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014) (citing *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987)), *abrogated on other grounds, Grogan v. Garner*, 498 U.S. 279 (1991). The Bankruptcy Code precludes "debtors from discharging liabilities incurred on account of their fraud." *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998). On appeal, Willmar seeks to exclude Dailey's debt from discharge under three possible subsections in 11 U.S.C. § 523(a). Relevant to this case, § 523(a) exempts from discharge: (1) any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, false representation, or actual fraud, 11 U.S.C. § 523(a)(2)(A); (2) any debt obtained using a written statement "respecting the debtor's … financial condition," 11 U.S.C. § 523(a)(2)(B); and (3) any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. 11 U.S.C. § 523(a)(6).

The Bankruptcy Court's conclusion that Dailey's debt to Willmar is not exempt from discharge under any of these subsections will be affirmed. First, the Bankruptcy Court correctly analyzed Willmar's § 523(a)(2) claim under § 523(a)(2)(A). Second, the Bankruptcy Court's determination that Willmar failed to prove the elements of § 523(a)(2)(A) was not clearly erroneous. Finally, the Bankruptcy Court did not err in concluding that Willmar did not prove its claim under § 523(a)(6).

**I. Analysis under 11 U.S.C. § 523(a)(2)(A) or (a)(2)(B)**

Willmar's primary argument before the Bankruptcy Court and on appeal is that Dailey's debt to Willmar[6] is nondischargeable because the Lien Waivers were fraudulent or contained false representations or pretenses. 11 U.S.C. § 523(a)(2)(A). Alternatively, Willmar argues that Dailey's debt is nondischargeable because the Lien Waivers concerned SequrComm's financial condition under 11 U.S.C. § 523(a)(2)(B). Claims for nondischargeability under § 523(a)(2)(A) and § 523(a)(2)(B) are mutually exclusive. *First Nat'l Bank of Olathe, Kansas v. Pontow (In re Pontow)*, 111 F.3d 604, 608 (8th Cir. 1997)). Thus, as a threshold matter, the Court must first determine which subsection is appropriate for Willmar's claims under § 523(a)(2). Because claims under subsection (a)(2)(B) require a written statement "respecting the debtor's ... financial condition," whether § 523(a)(2)(A) or § 523(a)(2)(B) applies turns on whether the alleged false statements in the Lien Waivers concern Dailey's overall financial condition. *Pontow*, 111 F.3d at 609.

In the Eighth Circuit, statements under § 523(a)(2)(B) are not limited to balance sheets or other financial forms but can include a much broader class of statements. *Pontow*, 111 F.3d at 609. For example, in *Pontow*, the representations fell under § 523(a)(2)(B) because the parties stipulated that the statements concerned the debtor's financial condition and the parties' arguments focused exclusively on § 523(a)(2)(B). Similarly, in *In re Long*, 774 F.2d 875, 877 (8th Cir. 1985), the court analyzed

---

[6] The parties do not dispute that Dailey owed a debt to Willmar. Although SequrComm incurred the debt and not Dailey personally, The Bankruptcy Court acknowledged in a previous ruling on the record that although the statements did not concern Dailey, as CEO, Dailey received a benefit from the alleged fraud. BK ECF No. 11, Audio File at 7:05. Dailey has not challenged the Bankruptcy Court's conclusion.

representations under § 523(a)(2)(B) where the statements appeared in the footnote of a financial statement and concerned the value of the debtor's entire inventory.

The alleged misrepresentations in this case were not statements concerning Dailey's financial condition. The Supreme Court recently held that the term "financial condition" means "one's overall financial status." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018). There is no evidence that Dailey's representations about SequrComm's payments to Anixter respected Dailey's overall financial status. Unlike the parties in *Pontow*, the focus of the parties' argument and the Bankruptcy Court's analysis in this case was § 523(a)(2)(A), not § 523(a)(2)(B). Further, the Lien Waivers related solely to payments or intended payments to suppliers. Thus, unlike the debtor in *In Re Long*, who made representations in a financial statement concerning a company's entire inventory, the statements in the Lien Waivers make no representation about SequrComm or Dailey's overall financial condition. Accordingly, the Bankruptcy Court properly analyzed Willmar's claims under § 523(a)(2)(A).

## II. Dischargeability Under § 523(a)(2)(A)

### A. Standard of Review

Willmar faces a high burden in proving its claims under § 523(a)(2)(A). A creditor seeking to exempt a debt from discharge under § 523(a) must prove the elements of its claim by a preponderance of the evidence. *Grogan*, 498 U.S. at 288. Further, as noted above, "[e]xceptions to discharge are usually narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code." *Fields*, 510 B.R. at 233. On appeal, whether a requisite element of a claim under § 523(a)(2)(A) has been satisfied is a factual determination which is reviewed for clear error. *In re Freier*,

604 F.3d 583, 587 (8th Cir. 2010) (citing *Pontow*, 111 F.3d at 609). A finding is clearly erroneous if, after reviewing all the evidence, the reviewing court is left with the firm conviction that a mistake has been committed. *Id.* (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

### B. Elements of § 523(a)(2)(A)

The elements of a dischargeability claim under § 523(a)(2)(A) are: (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was deliberately made for the purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained the alleged loss as the proximate result of the representation having been made. *Fields*, 510 B.R. at 233 (quotations and citations therein omitted). *See also Freier*, 604 F.3d at 587. The Bankruptcy Court found that Willmar failed to meet its burden on elements 2, 3, and 4.

Willmar asserts that Dailey knew or should have known that the Lien Waivers in question were false at the time he signed them. "Even if a false statement is made, no fraud exists unless the maker knows the statement is false at the time the statement is made." *Lindau v. Nelson*, 357 B.R. 508, 513 (8th Cir. BAP 2006). A representation satisfies the knowledge element when it is made "under circumstances where a debtor should have known of the falsity [or] is one made with reckless disregard for the truth." *In re Moen*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (quoting *In re Duggan*, 169 B.R. 318, 324 (Bankr. E.D.N.Y.1994). "In assessing a debtor's knowledge of the falsity of the representation . . ., the Court must consider the knowledge and experience of the debtor." *Id.*

12

Regardless of whether Dailey knew Anixter had been paid at the time he signed the Lien Waiver,[7] Willmar has not shown that Dailey had no intention to "promptly pay [Anixter] in full" using the money obtained from Willmar. *See* Lien Waivers, BK ECF Nos. 37, 38, 39, 86. In general, "[t]o qualify as a false representation or false pretense under 11 U.S.C. § 523(a)(2)(A), the statement must relate to a present or past fact." *In re Meahyen*, 422 B.R. 192, 201 (Bankr. D. Minn. 2010) (citations omitted). However, "[a] material promise to perform in the future 'made with the intent to defraud and without the intent to perform . . . constitutes actionable fraud.'" *Freier*, 604 F.3d at 588 (quoting *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1379 (8th Cir.1983)). Thus, a debtor's promise related to a future act can constitute a false representation where the debtor possesses no intent to perform the act at the time the debtor's promise is made. *See Fields*, 510 B.R. at 235. "[A] promise to pay a debt in the future is not a misrepresentation merely because the debtor fails to do so." *In re Church*, 328 B.R. 544, 547 (B.A.P. 8th Cir. 2005).

Appellate courts are deferential to the bankruptcy court's findings when determining whether a debtor's promise to perform constitutes actionable fraud. For example, in *Church*, the bankruptcy court found that a debtor's promise to pay was not fraudulent where the debtor made payments for several months after making the promise. *Id.* at 547-48. The Bankruptcy Appellate Panel concluded that the bankruptcy court's

---

[7] There was conflicting testimony at trial about whether Dailey knew Anixter had not been paid at the time he signed the Lien Waivers. Dailey testified that the first he learned of problems with Anixter on August 6, 2014, based on an email from Shane Sweet. Tr.(2) 136. While some of its findings are less than clear, the Bankruptcy Court found this assertion credible and specifically concluded that Dailey did not learn of the nonpayment to Anixter until August of 2014. Tr. 132; Tr.(2) 128. Other evidence in the record supported this finding. For example, Greg Boggs testified that in July 2014, Dailey told him that Anixter and other suppliers were either fully paid or "a little behind." Tr. 55. Having reviewed the record, the Court cannot conclude that the Bankruptcy Court's decision was clearly erroneous as to Dailey's knowledge.

findings were supported by the record. In *Fields*, a debtor obtained a loan by stating that he intended to use the borrowed funds for tenant improvements. 510 B.R. at 235. The bankruptcy court found that the evidence showed the debtor never intended to use the loan proceeds for that purpose. *Id*. The Bankruptcy Appellate Panel for the 8th Circuit upheld the bankruptcy courts findings under the clear error standard. *Id*. at 233, 236.

In contrast to *Fields*, the Bankruptcy Court concluded Willmar did not meet its burden to show Dailey never intended to use the funds to pay Anixter. Rather, as in *Church*, evidence supports the Bankruptcy Court's findings that Dailey intended to pay Anixter because he directed that Anixter be paid after he signed the Lien Waivers. Dailey testified that he learned of problems with Anixter when Shane Sweet advised him that SequrComm was on "a slow pay" to Anixter. Tr.(2) 94. Dailey understood this to mean that SequrComm was slightly behind on payments.[8] Dailey testified that he resolved the issue by directing Armitage to send payment to Anixter. Tr.(2) 94. Armitage agreed and "next thing I know we're getting more supplies." Tr.(2) 94. Willmar does not dispute that Anixter again provided supplies to SequrComm. Although Anixter was not actually paid, Dailey's direction to pay Anixter combined with evidence that Anixter re-opened the supply chain support the Bankruptcy Court's finding that Dailey intended to pay Anixter with the funds obtained from Willmar, as promised in the Lien Waivers.

---

[8] The Bankruptcy Court noted that Dailey may have known there was a problem, at the earliest, from July 7 to 11, when Stephen Boggs allegedly confronted Dailey about the nonpayment to Anixter. Tr. 132; Tr.(2) 128. Stephen Boggs inferred that this exchange occurred in July, Tr. 119-20, whereas Dailey testified that this exchange took place in August, Tr. 137. The Bankruptcy Court concluded that regardless of when the exchange took place, the exchange was not sufficient to notify Dailey that a huge balance was owing to Anixter. Stephen Boggs testified that he confronted Dailey because S. Boggs was no longer able to order supplies from Anixter. There was no evidence that S. Boggs told Dailey that SequrComm was severely behind in payments to Anixter. Further, S. Boggs corroborated Dailey's testimony that he paid Anixter to reopen the supply chain. Tr. 121.

Willmar also asserts that Dailey's knowledge of SequrComm's financial issues preclude a finding that he intended to pay Anixter. Willmar argues that Dailey had extensive control of SequrComm's finances, including decisions about who would be paid. Tr. 111; Tr.(2) 39-40. Armitage testified that she discussed the Anixter nonpayment with Dailey in June 2014. Tr. 79. According to Willmar, Dailey should have known that SequrComm was in severe debt to Anixter and would have no way to pay promptly and in full. Thus, Willmar argues Dailey defrauded Willmar when he promised in the Lien Waivers that SequrComm would pay Anixter. The Bankruptcy Court assessed Willmar's arguments and evidence and made credibility determinations, concluding that although it was unclear whether Dailey had access to accounting records, most of the evidence suggested he did not. Tr.(2) 128. The Bankruptcy Court also concluded that it "had a little trouble believing the testimony of Ms. Armitage." Tr.(2) 132-33. Although the Bankruptcy Court expressed concerns with the credibility of all witnesses, it found that Willmar had not met its burden. Tr.(2) 133. Based on the evidence in the record, the Bankruptcy Court did not clearly err in making this determination.

Willmar also suggests Dailey committed fraud because he intended to pay other creditors, such as GWB, instead of Anixter. There is evidence that Dailey sought funding from GWB and others in May of 2014, and that GWB called a SequrComm loan as early as May 2014. An email exchange from May 21, 2014, demonstrates that Greg Boggs, a SequrComm employee, told Tom Fischer of GWB that SequrComm would pay GWB out of the proceeds of Willmar's payments to SequrComm. BK ECF No. 63. Dailey was included on the email from May 21, 2014, but not on subsequent emails wherein Chris Armitage agreed to terms of progress payments to GWB. BK ECF No. 63 at 2. Willmar

15

infers that, beginning with this email exchange, Dailey and others devised a plan whereby he would sign the Lien Waivers to get funds from Willmar to pay Anixter, but instead of paying Anixter, Dailey would divert the money to pay GWB. Yet there is also evidence that, after signing the Lien Waivers, Dailey attempted to resolve payment issues with Anixter and directed Armitage to make payments to Anixter. Armitage even testified that the purpose of getting loans from GWB may have been to pay Anixter. Tr. 85-86.

There is insufficient evidence to disturb the Bankruptcy Court's conclusion that Willmar failed to meet its burden as to Dailey's intent. Accordingly, the Bankruptcy Court's finding was not clearly erroneous.

### III. Nondischargeability under 11 U.S.C. § 523(a)(6)

Willmar argues that, in addition to fraud pursuant to § 523(a)(2)(A), Dailey's debt is nondischargeable under 11 U.S.C. § 523(a)(6). Section (a)(6) precludes from discharge, "any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." To establish a claim under § 523(a)(6), Willmar must show by a preponderance of the evidence: that (1) the debt is for "willful injury," and (2) the debt is for "malicious injury." *In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008). "Willful injury" as used in the statute, requires a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). As with § 523(a)(2), nondischargeability under § 523(a)(6) is strictly construed to effectuate the fresh start of the Bankruptcy Code. *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 853 (8th Cir. 1997), *aff'd sub nom., Kawaauhau v. Geiger*, 523 U.S. 57 (1998).

For the reasons stated above, the Bankruptcy Court did not err in finding no evidence of willful or malicious injury. There is no evidence in the record of Dailey's

16

malice toward Willmar, much less that Dailey intended specifically to harm Willmar. The evidence supports the Bankruptcy Court's finding that Willmar failed to meet its burden under § 523(a)(6).

**CONCLUSION**

The record before the Court supports the Bankruptcy Court's decision. Because the Lien Waivers in question did not concern Dailey's or SequrComm's overall financial condition, the Bankruptcy Court properly analyzed Willmar's claim under 11 U.S.C. § 523(a)(2)(A). Evidence supported the finding that Dailey intended to pay Anixter at the time Dailey executed the Lien Waivers, and that the representations in the Lien Waivers were not fraudulent. The Bankruptcy Court's decision to dismiss Willmar's claims under 11 U.S.C. § 523(a)(2)(A) and (a)(6) was not clearly erroneous. The judgment of the Bankruptcy Court will be affirmed, and a separate judgment will be entered in accordance with this Memorandum Opinion.

Dated this 19th day of September, 2018.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge